```
                    UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MASSACHUSETTS

                                         Civil Action
                                         No. 07-10162-WGY

    *  *  *  *  *  *  *  *  *  *  *  *  *
                                      *
    IN RE TJX COMPANIES RETAIL         *
    SECURITY BREACH LITIGATION         *
                                      *
    _____     *
                                      *
    THIS DOCUMENT RELATES TO:    *    FAIRNESS HEARING
    CONSUMER TRACK ACTIONS       *
                                      *
    *  *  *  *  *  *  *  *  *  *  *  *  *
                 BEFORE:  The Honorable William G. Young,
                              District Judge

APPEARANCES:

         STERN, SHAPIRO, WEISSBERG & GARIN LLP (By
    Jonathan Shapiro, Esq.), 90 Canal Street, Suite
    500, Boston, Massachusetts 02114-2022, on behalf
    of Plaintiffs

         SHAPIRO, HABER & URMY, LLP (By Thomas G.
    Shapiro, Esq.), Exchange Place, 37th Floor,
    53 State Street, Boston, Massachusetts 02109,
    on behalf of Plaintiffs

         BERGER & MONTAGUE, P.C. (By Sherrie R.
    Savett, Esq. and Jon J. Lambiras, Esq.), 1622
    Locust Street, Philadelphia, Pennsylvania 19147,
    on behalf of Plaintiffs

         WOLF POPPER, LLP (By Lester L. Levy, Esq.)
    845 Third Avenue, New York, New York 10022, on
    behalf of Plaintiffs

         BARNOW & ASSOCIATES, P.D. (By Ben Barnow,
    Esq.), 1 North LaSalle Street, Suite 4600,
    Chicago, Illinois 60602, on behalf of Plaintiffs


                                    One Courthouse Way
                                    Boston, Massachusetts

                                    July 15, 2008
```

1          **A P P E A R A N C E S** (Cont'd)

2

3          ROPES & GRAY (By Harvey J. Wolkoff, Esq.,
   Mark P. Szpak, Anne E. Johnson, Esq. and Matthew
4  L. McGinnis, Esq.), One International Place,
   Boston, Massachusetts 02210, on behalf of TJX
5  Companies, Inc.

6          SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
   (By James R. Carroll, Esq.), One Beacon Street,
7  Boston, Massachusetts 02108
                - and -
8          VORYS SATER SEYMOUR and PEASE LLP (By W.
   Breck Weigel, Esq.), 221 East Fourth Street, Suite
9  2000, Cincinnati, Ohio 45202, on behalf of Fifth
   Third Bank and Fifth Third Bancorp

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              **PROCEEDINGS - 2:00 P.M.**

2

3              **THE CLERK:**  Calling Civil Action 07-10162, In re

4    TJX Companies Retail Security Breach Litigation.

5              **THE COURT:**  Please be seated.  Court's in session.

6              And would counsel identify themselves.  For the

7    plaintiffs?

8              **MR. THOMAS SHAPIRO:**  Good afternoon, your Honor.

9    Tom Shapiro, Shapiro, Haber & Urmy.

10             **MS. SAVETT:**  Sherrie Savett, Berger & Montague.

11             **MR. LEVY:**  Lester Levy, Wolf Popper.

12             **MR. BARNOW:**  Good afternoon, your Honor.  Ben

13   Barnow.

14             **MR. JONATHAN SHAPIRO:**  Jonathan Shapiro.

15             **MR. LAMBIRAS:**  Jon Lambiras from Berger & Montague.

16             **THE COURT:**  For the defense?

17             **MR. WOLKOFF:**  Good afternoon, your Honor.  Harvey

18   Wolkoff, Ropes and Gray, on behalf of TJX, together with

19   Mark Szpak, Anne Johnson, and Matt McGinnis.

20             **MR. CARROLL:**  James Carroll, your Honor, for Fifth

21   Third, together with Breck Weigel from Cincinnati.

22             **THE COURT:**  Thank you.

23             **MR. WEIGEL:**  Good afternoon, your Honor.

24             **THE COURT:**  Now, this is a fairness hearing under

25   Federal Rule of Civil Procedure 23.  There have been filed

1    various written objections to the proposed settlement, all

2    of which I have read carefully and all of which I have

3    caused to be filed in the record.

4         Does anyone appear in opposition to the settlement

5    here this afternoon and wish to be heard?  No one responds.

6         I have but two questions, two issues, I guess, and

7    I'll back into them directly.  I am -- I'm going to --

8    attorneys' fees first.

9         I am not troubled by the amount of the attorneys'

10   fees relative to what I understand to be the economic

11   benefit, both tangible, direct payment, and intangible,

12   monitoring and the like.  So the amount of the attorneys'

13   fees is fine.  I propose, however -- who's the plan

14   administrator that you've retained here?

15        **MS. SAVETT:**  They're called EPIQ, E P I Q.

16        **THE COURT:**  Well, I'll cut right to the chase.  I

17   propose that the attorneys' fees be paid out in proportion

18   to the actual transfer of value of the settlement funds to

19   the beneficiaries.  That is to say, I understand that the

20   economic benefit to the class -- correct me now and as you

21   are officers of the Court -- is in excess of 18,

22   $20 million.  Correct?

23        **MS. SAVETT:**  Well, if you evaluate it in terms of

24   what's been offered to the class it's over $200 million.

25        **THE COURT:**  All right.  Fine.

1      **MS. SAVETT:**  And the biggest proponent of that, of

2    course, is the identity theft insurance and the credit

3    monitoring which amounts to about $177 million if you take

4    the number of people that it was offered to times what the

5    premium would have been had they had to go out and buy it.

6      **THE COURT:**  I simply want the payout to the

7    plaintiff attorneys in amount to not exceed one-third of the

8    actual transfer of value.  That is to say, if you are paying

9    out vouchers plus credit monitoring in the amount of

10    $6 million, the attorneys at that point get two;

11    $12 million, the attorneys get four; $18 million, the

12    attorneys get six; a little more than that, the attorneys

13    get 6.5, and that caps it.

14      Do I make myself understood?

15      **MS. SAVETT:**  Yes, your Honor.

16      **THE COURT:**  Can the plan administrator do that?

17      **MS. SAVETT:**  They can.

18      **THE COURT:**  I want them to.  All right.

19      **MS. SAVETT:**  Is there any point, your Honor, to

20    discuss that point with you?

21      **THE COURT:**  Of course.  This is a hearing.

22      Mr. Wolkoff, I mean, this isn't hurting you.

23      **MR. WOLKOFF:**  No, it's not, your Honor, although

24    TJX is paying, of course, the attorneys' fees and has agreed

25    to pay up to $6.5 and that's separate and apart from

1    whatever is paid out.  I simply rise to point out a couple

2    of things, your Honor, with regard to your Honor's statement

3    about how much has been paid out.

4        Of course the time to apply for vouchers doesn't

5    run out until October and the time to apply for identity

6    theft reimbursement doesn't run out until even after that

7    into 2009.  But so far, the total value that has been paid

8    out, not paid out, but the total value that has been

9    claimed, including the special event, which the --

10            **THE COURT:**  Exclude the special event.

11            **MR. WOLKOFF:**  Excluding the special event, your

12   Honor, so far approaches $6 million.

13            **THE COURT:**  Right.  Thank you.  Thank you.

14            Yes, it's a hearing.  I'll hear you.  I obviously

15   came on the bench thinking that was a wise thing.  Why is

16   that not fair to the plaintiffs?  Plaintiffs' counsel?

17            **MS. SAVETT:**  Well, your Honor, I don't think it's

18   fair because we have made much, much more available to

19   people than they chose to accept, and there are a great many

20   cases and circuit court cases as well that discuss this

21   very point, is the fee request supposed to be based on what

22   actually is taken by the class members or what is offered or

23   made available to them.  And we didn't brief this and I

24   would be happy to, but I'm prepared to give you some of the

25   leading cases on the point.

1        **THE COURT:**  I'll tell you what.  Here's what I

2   propose.  No one's here objecting, but I propose that the

3   payout up to the cap of $6,500,000 be proportionate as I

4   have stated to the actual payout, people actually getting

5   money, or getting the credit monitoring.

6        Here's why.  That ensures counsel's best efforts --

7   and I'm perfectly satisfied with counsel -- counsel's best

8   efforts to get money benefit, tangible, into the hands of

9   the class.

10       Now, I propose that you get a transcript of this

11  hearing and I want an acknowledgment from the plan

12  administrator that that's the Court's order.  That's subject

13  to your briefing it and my further considering it.

14       I would like a brief on it.  I understand what some

15  of the cases have said.  It seems to me in a consumer class

16  action such as this the primary benefit should be to the

17  consumer.

18       Now, the second issue.  The attorneys general who

19  have objected, and their objection is a modest one, they

20  seem to me to have a great point.  I don't oppose TJX

21  holding a one-day sale event, and I don't in any way oppose

22  or try to curb TJX from saying this is in apology for what

23  happened or this is in thanks for our faithful customers, or

24  whatever TJX wants to say.  But, on reflection, I think the

25  attorneys general have a point.  Just holding a sale ought

1    not be part of a court approved settlement.

2         The other parts, the actual cash transfers and the

3    credit monitoring, those the Court does approve, and as I've

4    said, I think they're quite creative and I praise, I praise

5    all counsel.  So, I'm fine with the sale.  I just don't want

6    anyone saying the Court ordered it or the Court approves it,

7    or any attorneys' fees turn on the fact that TJX is having a

8    sale.  That's my only other reservation, and again I'll hear

9    you if anyone wants to be heard on it.

10            **MS. SAVETT:**  May I --

11            **THE COURT:**  Yes.

12            **MS. SAVETT:**  May I address that?

13            **THE COURT:**  Yes.

14            **MS. SAVETT:**  I mean, even if you put the sale aside

15   it represented a very small part of what we considered the

16   benefit offered.

17            **THE COURT:**  Oh, I agree.

18            **MS. SAVETT:**  I don't --

19            **THE COURT:**  I agree with that.

20            **MS. SAVETT:**  I don't even want to address

21   that point.  But I think the really fundamental point is

22   that our efforts went into getting this whole package

23   available to people.  And as the Court said in Masters v.

24   Wilhelmina Model Agency, the Second Circuit, 2007:  The

25   Entire Fund, and not some portion thereof, is created

1   through the efforts of counsel at the instigation of the

2   entire class.   An allocation of fees by percentage should

3   therefore be awarded on the basis of the total funds made

4   available whether claimed or not.   And then numerous other

5   cases are cited.

6          **THE COURT:**   Yes, here's the problem with that

7   reasoning.   In the real world of class action litigation

8   defendants analytically, and quite properly, can calculate

9   that the amount claimed of a certain fund is going to be

10  significantly less than the amount offered in actual value.

11  There's a risk, but especially the more you burden the

12  claims form, the less likely it is that you are going to get

13  a hundred percent of the claimants to whom the benefit is

14  due actually making the claim.   Defendants negotiate knowing

15  that.   Plaintiffs' counsel negotiate knowing that, and in

16  reliance upon the cases that you just cite.

17          Consumer class litigation, it seems to me the

18  preferable, it seems to me my duty as fiduciary for the

19  class is to see that the class get the benefit.

20          This is an excellent settlement.   This is a

21  settlement which in large measure is self-executing.   I

22  think that it is unlikely that anything less than the total

23  attorneys' fees of $6.5 million will ultimately be paid.

24  But, I want your efforts to get the money out there.

25          **MS. SAVETT:**   Your Honor?

1          **THE COURT:**  Again, my mind is open to briefing on

2     the subject.  But at least that argument that you've just

3     advanced doesn't resonate with the Court.

4          **MS. SAVETT:**  I would like to deal with one of the

5     other arguments you just made, your Honor, that we all knew

6     when we negotiated the settlement that a small percentage or

7     not everybody would take it.  And that really isn't the

8     case.  We fought very hard to simplify the settlement

9     process so much and make it easy.  And I would like to give

10    you a really concrete example.

11         One of the big portions of the benefit has to do

12    with the self-certifying claim for vouchers.  And we

13    recognized that people had very little in out-of-pocket

14    damage, and they probably wouldn't have any proof of it.

15         So, for one of the funds, which has a cap of

16    $10 million, in order for a person to get a $30 voucher, or

17    the $15 cash, the check in lieu, all they had to do was

18    check two boxes.  One says I made my purchase at TJX during

19    this period.  Check.  And the second one was I incurred at

20    least $5 in out-of-pocket damages or spent at least one hour

21    of time trying to rectify the situation.  Check.  And if

22    they do that and if they turn it in they automatically get a

23    $30 voucher or $15.

24         Now, I think that is about as simplistic and as

25    easy of a possible claim procedure as you could have.

1    **THE COURT:** I do, too.  I'm very proud of that

2    having been one of the ones who spoke in favor of cash money

3    as opposed to vouchers.

4    All right.  Well done.  Why are you then objecting

5    to being paid out when that works?  I want to see that it

6    works.

7    **MS. SAVETT:** Well, the problem is that the claims

8    process has been going on for a while now, and Mr. Wolkoff

9    just gave you the results so far.  And it's somewhat

10   disappointing to us that there aren't larger claims.  It's

11   not because they were difficult or they weren't notified.

12   The notice program was incredibly complex, a multimedia

13   approach, and hit 85 percent of the shoppers that it was

14   intended to hit at least.  But that's the result.  But we as

15   counsel worked as hard as we could to get the best result in

16   a tough case.

17   **THE COURT:** Are you suggesting that that's the bulk

18   of the claims we're going to have here is --

19   **MS. SAVETT:** Well, I don't know.

20   **THE COURT:** -- about six, eight million dollars?

21   **MS. SAVETT:** I know that with regard to the credit

22   monitoring insurance that probably is the bulk of the claims

23   for this reason.

24   There was a cutoff of the end of May, which has

25   been extended for certain people, but not for all, until, I

1    believe July 15th.  But I don't think we're going to get

2    that many more claims there.  Because, as I understand it,

3    the only ones that are still allowed to claim are ones where

4    they had a wrong address, the defendants were able to get a

5    correct address, and there were about 200 that they sent out

6    again.  So I don't think that number is going to change

7    materially.

8            The other part of it is the vouchers.  And they

9    have all the way until, I think October 19th to submit them.

10   It's a complete guessing game whether or not the bulk of

11   them are in or not.  I mean, in my experience with claims, a

12   lot of them get filed in the beginning and then a group get

13   filed at the very end.  But it was -- we gave a very long

14   period for people to be able to do it.  And this may be the

15   bulk of it.  I don't know.  I mean, I hope there are more.

16           But we as counsel expended all of our time and

17   effort to make this very simple process available with these

18   excellent benefits as you have said.  And if the result were

19   that there weren't many more claims and we got a $2 million

20   fee, it would represent like about 60 percent of the time we

21   spent developing this case.  And that wouldn't be our fault.

22   Because we really did provide these tremendous benefits

23   here.

24           THE COURT:  But then there's something, isn't there

25   something wrong then with the operation of Rule 23 in the

1   consumer class action situation.  I would like you to brief

2   it and I will read these cases.  But it just -- I stick on

3   the point that it cannot be that this significant litigation

4   creates a benefit that is virtual rather than real.  The

5   consumers should benefit and the attorneys should have a

6   respectable portion of the amount actually conferred.  It

7   doesn't persuade me to say that theoretically there's a

8   benefit of $200 million when in actuality it looks like the

9   payout is going to be something less than ten.

10          **MS. SAVETT:**  Your Honor, let's look at the credit

11  monitoring relief that we got for people and the identity

12  theft insurance.

13          We, we worked with the defendants to craft a letter

14  to people that would make it not intimidating, emphasize to

15  them how important the benefit was.  And I don't understand

16  why anyone in their right mind wouldn't take that.  Most

17  people didn't know it even existed before.  It would have

18  cost them almost $400 if they could even have found out

19  about it.  But maybe there was something like, I'm making

20  this up because I don't know if it's true, that people

21  didn't want to give their Social Security number to get the

22  insurance because they were afraid of doing that, or some

23  irrational belief or some fear.  But as counsel, we did our

24  best to get them, we thought that was the most important

25  relief that we could possibly get in this case because the

1    real danger was the threat of identity theft, that these

2    thieves would sell the information on some black market and

3    use it in two years or three years.

4         Well, a lot of people did take it as I understand.

5    I think over 12,000 people did take it.  But there were so

6    many more that could have that didn't.  But should counsel

7    be penalized for whatever the reason is that people

8    didn't --

9         **THE COURT:**  This case is not about benefiting

10   counsel.  This case is about settling the inchoate claims of

11   a very large class in light of the calculus of defense --

12   TJX isn't admitting anything.  For them it's a cost-benefit

13   thing.  No one says they're liable for anything.  But it's

14   not about benefiting counsel.

15        And the odd thing is, you see, I have said

16   throughout, I've made my minor criticisms, I think you have

17   been very creative.  I've approved, I've approved willingly

18   the notices.  They seemed simple to me.  They seemed as

19   simple as possible.  I pressed, to the extent of my limited

20   creativity, for a self-executing scheme, a scheme that would

21   put benefit in the hands of the consumer the negotiated

22   benefits.

23        I sense here, or maybe not sense, I have, I guess,

24   some institutional concerns.  You should take nothing that

25   I've said this afternoon as criticism of counsel.  Far from

1    it.  I mean, I've read these isolated letters, and they're

2    few in relation to the alleged harm and the scope of the

3    class, they're very few, saying, well, attorneys ought not

4    get this money, this isn't very much.  But given the nature

5    of the small individual claims, I thought and think this is

6    a wonderful job.

7         I guess I'm struck by the fact, were it to be a

8    fact, that twelve months from now, theoretically, and I have

9    praised TJX for its creativity and its willingness to

10   settle, but I'm struck by the fact that if, when all the

11   dust settles, the consumers get value, we'll pick a number,

12   nine million, ten million, and the attorneys get, the

13   plaintiffs' attorneys get 6.5 million, if that's where it

14   all settles, it seems to me that something is wrong

15   institutionally with the nature of this litigation.

16        It is a matter I would be delighted to have

17   briefed.  And I guess, I mean, I have to hold this hearing

18   and I've held it and we ought to go ahead on approving

19   everything.  But subject to my revising it, the sale, which

20   certainly may take place, is a matter entirely of TJX's

21   marketing, and they're not to say that it is imposed by the

22   Court or part of a class settlement, that's decided.

23        The business of attorneys' fees is capped at a

24   proportion of payout subject to my further review.

25        **MS. SAVETT:**  Your Honor?

1           **THE COURT:**  I'll take briefs.

2           **MS. SAVETT:**  Your Honor, one other point --

3           **THE COURT:**  Yes.

4           **MS. SAVETT:**  -- I would ask you to consider.

5           I think that you should consider in the concrete

6    benefit that we've been able to achieve the $4 million that

7    was spent by TJX to do this massive notice program because

8    there wouldn't have been any benefit whatsoever if that

9    hadn't been done.  And that was something heavily negotiated

10   by us.  We thought it was extremely important that they

11   publish widely in newspapers throughout the United States,

12   Canada and Puerto Rico, that they use periodicals, that they

13   set up the website, which has gotten hundreds of thousands

14   of hits, that they set up the phone line, which has, I

15   believe has had about thirty some thousand phone calls and

16   keeps getting them.

17          I mean, these were all things -- we wanted to give

18   the most relief that we could, and we thought an

19   important point that we negotiated was this excellent notice

20   program.  And that's a very concrete benefit that we got,

21   because there wouldn't have been any claims but for that.

22          And so, I would hope that you would at least, I

23   hope I can convince you on the broader point, but I think, I

24   think it's rational to consider the money that was actually

25   spent on the notice which enabled anybody to get any relief

1    and get them to know about it as part of the concrete

2    benefit we were able to get to consumers.

3         THE COURT:  I certainly will accept briefs and you

4    can make that point.

5         MS. SAVETT:  And then another point, your Honor,

6    and it's very hard to value this, is that we believe that

7    we, part of our settlement and the achievement here was to

8    gain enhanced improvements to the security system of TJX.

9         Now, it may be that they --

10        THE COURT:  I'm not so sure you can take benefit

11   from that.

12        MS. SAVETT:  We can't take full credit.

13        THE COURT:  Yes, you can't take full credit because

14   they had to settle with the, with the banks.

15        One of the things that has struck me here is how

16   efficient in terms of litigation expenses is the wholly

17   extralegal operations of Visa and MasterCard.  They're

18   running their own little, I shouldn't say little, they're

19   running their own massive dispute resolution program which I

20   knew nothing about until there was this case with what seems

21   to me extraordinary efficiency relative to the costs, delay,

22   and expense of litigation.  We have much to learn, we in the

23   courts have much to learn.  Of course maybe Visa and

24   MasterCard hold a whip hand here that the courts don't.

25        If we look at these things, and I have tried to, as

1    institutional phenomenon how the law works best to achieve

2    justice, one of the most impressive aspects of the entire

3    snarl has been the conduct of Visa and MasterCard.  I don't

4    say you didn't help.  You did.  But they certainly have been

5    impressive and I have said that on the record and I'll say

6    it again.

7            You're taking, because I've capped it this way, and

8    that's not what you expected, and it hasn't been briefed,

9    you're taking it that you and the Court are adversaries

10   here.  And really that's not so.  I have no better notice

11   program than you proposed.  I know of no more creative

12   settlement than zealous counsel have come up with.  I'm the

13   first to say so.

14           My problem, I'm overusing the word institutional,

15   my problem is it just seems odd to me, and of course I'm

16   held to my own duty, my duty is to be a fiduciary to the

17   class.  If they get nine million and the attorneys get

18   6.5 million, I've got some problem.  Even if -- it's not

19   like -- on the other hand, I suppose arguing against myself,

20   it's not like they're going to get it, TJX is ready to pay

21   the whole 6.5 million, and if people came in for another

22   nine million, timely, as we've given them notice, TJX would

23   have to pay that and they stand ready to pay it.  I guess

24   I'm sensitive to that and that's part of the rationale of

25   the Second Circuit opinion and I'm sure these other

1  opinions.

2      **MS. SAVETT:**  It is certainly different than the

3  common fund situation --

4      **THE COURT:**  Yes.

5      **MS. SAVETT:**  -- where it's a percentage taken out

6  of the recovery.  Here, it's over and on top.

7      Your Honor, could I just review for you one aspect

8  of the settlement that I think is relevant here.

9      **THE COURT:**  Yes.

10     **MS. SAVETT:**  It has to do with the security system,

11  and taking some credit for the improvements.  Something we

12  negotiated very hard, and it was probably just about the

13  last term that we were able to negotiate that the defendants

14  finally accepted at the end, is that we developed a process

15  and the process was at a certain date the defendants had to

16  submit to us and to our independent expert a report of the

17  current state of their security system, the improvements

18  that they had made in the last period since the incursion up

19  until that time, and what they planned to do in the near

20  future.  And the entire settlement was contingent upon our

21  independent expert opining to us that they were really

22  reasonable efforts to enhance the security system and

23  protect the customers in the future.  And we were actually

24  holding our breath because we didn't, we couldn't understand

25  all the technicalities of the security system and we didn't

1    know what our expert was going to say.  And in the end our

2    expert opined that the efforts made by TJX to enhance the

3    system and what they were going to do in the immediate

4    future really were a good faith and a very reasonable effort

5    to avoid a future incursion.

6           Now, they may have done some of that on their own.

7    Maybe they would have done some of it in connection with the

8    pressure from the credit card companies.  But I believe that

9    it's hard to argue that our lawsuit wasn't a part of making

10   sure that they were really going to do a good job to protect

11   these consumers at the end of the day and in the future.

12          And it's just like in Delaware.  The courts are

13   always having to deal with, when there's a takeover of some

14   type, and the plaintiffs come in and they say, well, we had

15   a big role in this, and there's some gigantic institutional

16   investor that had his own case, and who knows exactly who

17   caused the pressure to bump up the price of that merger.

18   But the Delaware courts very frequently, they say, well,

19   yes, there's a direct causal connection to this improvement

20   and we have to accord some of the benefit and some of the

21   credit to the shareholders.  And I think we deserve as

22   consumers some of the credit, too, for the vastly improved

23   system that they now have so that the very class that we

24   represent can go into TJX with comfort and say I'm not

25   scared now that my credit card's going to be stolen.

1          **THE COURT:**  I agree.

2          **MS. SAVETT:**  So I think that -- I don't know how

3     you put that into dollars.  But I think -- I would hope the

4     Court would give us some, some credit in a monetary way for

5     that because that was a very substantial benefit we got.

6          **THE COURT:**  Here's what we are going to do.  I

7     really do respect your advocacy.

8          The settlement, but for the, but for the sale,

9     which may take place, and the Court has nothing to say about

10    that, it's just not part of the settlement, the settlement

11    is approved.  Attorneys' fees not to exceed $6,500,000 are

12    approved.  For the moment -- this is the change -- for the

13    moment, the plan administrator will not pay them out other

14    than proportional to the actual benefits transferred as I

15    have set forth, and the plan administrator will acknowledge

16    having read the transcript of this proceeding.

17         Briefs on the issue will be received by the Court,

18    what shall we say, 30 days?  I do want to reflect further on

19    this.  So, 30 days and I'll enter a further order.  Is that

20    understandable?

21         **MS. SAVETT:**  It is, your Honor.  I just --

22         **THE COURT:**  Is that an appropriate time?

23         **MS. SAVETT:**  Oh, it's fine.  We could even do it

24    sooner if you wanted us to.

25         **THE COURT:**  It's not really an adversary proceeding

1   because I -- the only brief I really expect is yours.  So if

2   it's sooner, I'll be working on it sooner.

3           **MS. SAVETT:**  The one point I wanted to make, and

4   it's a relatively small one, is that it was six, six

5   and-a-half million dollars in fees and up to $150,000 in

6   out-of-pocket costs.

7           **THE COURT:**  And those are approved and your

8   certification of those costs to TJX satisfies the Court in

9   accordance with the, in accordance with the actual

10  settlement.

11          Good.  Thank you all.  We'll recess.

12          **THE CLERK:**  All rise.

13          **MR. WOLKOFF:**  Thank you, your Honor.

14          (Whereupon the matter concluded.)

15

16

17

18

19

20

21

22

23

24

25

1               **C E R T I F I C A T E**

2

3

4          I, Donald E. Womack, Official Court Reporter for

5    the United States District Court for the District of

6    Massachusetts, do hereby certify that the foregoing pages

7    are a true and accurate transcription of my shorthand notes

8    taken in the aforementioned matter to the best of my skill

9    and ability.

10

11

12

13

14          /S/ DONALD E. WOMACK
            _____
15              DONALD E. WOMACK
            Official Court Reporter
16               P.O. Box 51062
           Boston, Massachusetts 02205-1062
17              womack@megatran.com

18

19

20

21

22

23

24

25